# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00344-COA

**BENNIE GUNN A/K/A BENNIE LEE GUNN**                    **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2012 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | VICKI L. GILLIAM |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: STEPHANIE BRELAND WOOD |
| DISTRICT ATTORNEY: | ROBERT SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT IV, CAPITAL MURDER, AND SENTENCED TO LIFE WITHOUT PAROLE; COUNTS V AND VII, FELON IN POSSESSION OF A FIREARM, AND SENTENCED TO TEN YEARS FOR EACH COUNT; COUNTS VI AND VIII, ARMED ROBBERY, AND SENTENCED TO THIRTY-FIVE YEARS FOR EACH COUNT; AND COUNTS IX AND X, AGGRAVATED ASSAULT, AND SENTENCED TO THIRTY YEARS FOR EACH COUNT, WITH ALL SENTENCES TO RUN CONSECUTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED: 11/04/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ROBERTS AND CARLTON, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.    Bennie Gunn was convicted of capital murder, two counts of felon in possession of

a weapon, two counts of armed robbery, and two counts of aggravated assault. Gunn argues multiple issues on appeal: (1) the trial court erred when it failed sua sponte to sever a multiple-count indictment; (2) the trial court erred when it allowed the State to introduce improper evidence and the State emphasized that evidence in closing argument; (3) the firearm enhancement subjected Gunn to double jeopardy; (4) the State improperly commented on Gunn's right to remain silent; (5) the verdict was against the overwhelming weight of the evidence and the evidence was insufficient to support the verdict; (6) Gunn received ineffective assistance of counsel; and (7) cumulative error requires reversal. We find no error and affirm.

## FACTS

¶2.     This case involves events that occurred over three days from September 10-12, 2010. On September 10, William Morris made a delivery to the Super Save store in Jackson. While there, he was shot and killed. The store clerk, Harminder Kaur, testified that she heard a noise outside and saw Morris holding his stomach. Morris fell in the doorway of the store and later died. Kaur called the police.

¶3.     Sergeant Kim Harrison retrieved the store surveillance video and saw two black males who had something covering their heads. They approached the gas pumps and then disappeared from view. A few seconds later, Morris came into view on the video. He was staggering and holding his left side. Morris grabbed the door to the store and fell in the doorway.

¶4.     Kaur testified that she recognized one of the two men in the video, the older of the two, as a regular customer. She refused to point out the man she recognized in the courtroom

2

because she was "scared." She explained that she had three children, she had to continue working at her family-owned store, and the man she recognized shopped in her store.[1] The police canvassed the surrounding area of the store and found a white tank top and a black t-shirt lying in a nearby vacant field. DNA tests connected both of the shirts to Dante Evans,[2] but not to Gunn.

¶5. Loran McDougal lived near the Super Save. She was on her porch when she saw two men walk up the street and look back. She saw a police car drive into the area. When the police car turned on its siren, the two men ran into her neighbor's backyard. Loran went inside her house and told her stepdaughter, Rokita McDougal, to look outside. Rokita walked outside and saw two men in the neighbor's yard. One of the men looked at her, so she ran back inside. Rokita gave the police descriptions of the men. One of the men had on black Nike tennis shoes with a green "swoosh." She was shown a photo lineup and identified Gunn as the man in the yard with the Nike tennis shoes. She identified the shoes recovered from Gunn as similar to those she saw on one of the men that day. She identified Gunn in the courtroom as one of the two men she saw in her neighbor's yard that day.

¶6. On September 11, 2010, Sylvester Wright stopped at the Shell station on Terry Road in Jackson to buy cigarettes. While inside the gas station, Wright noticed two men get inside his vehicle. He ran outside to stop them. He testified to the following:

I seen one person jump in, and that's what made me run out of the store . . . .

---

[1] There was testimony that Gunn lived in the neighborhood.

[2] Evans pled guilty to the capital murder of William Morris in April 2012. He was sentenced to life without parole in the custody of the Mississippi Department of Corrections. The other charges were remanded as part of the plea deal.

[He was] on the driver's side . . . . I ran out. And it was one guy standing on the passenger side, and I shoved him away from the car . . . . I reached inside the car and asked the – shorter guy what he was doing, and he said he was fixing to take my car. And I was like, "You wasn't fixing to take nothing," and then the tall – and he told the taller guy to "[s]hoot that – shoot that [mf]." . . . When I turned around, I seen the gun and I started running.

¶7.     Wright was shown two photo lineups and was able to identify the two men who took his car. He identified Gunn in the courtroom as the shorter man telling the taller, thinner man to shoot him. Wright's vehicle was found three days later burned in a field.

¶8.     On September 12, 2010, twelve-year-old Om Patel sat with Naveen Ava, the desk clerk of the E. Com Lodge in Jackson. Patel testified to the following:

Well, we were watching TV. Then we hear a bang. So we're wondering, you know, what's going on. So he goes in the hallway and checks what it is and he just falls down. And so I'm wondering what happened. And then these two guys in wolf masks come in and shoot me and then ask me for money . . . . They said, "Give me the money." And so I crawled to the cash register and I opened it.

¶9.     Patel further testified that the men had trouble with the cash register and they pulled it so hard they broke it. Patel called the police after the men left. Both Patel and Ava were taken to the hospital and treated for their gunshot wounds. Police obtained a video surveillance tape which was consistent with Patel's testimony. The identity of the two robbers could not be ascertained from the video.

¶10.    On September 14, 2010, a BOLO, which stands for "be on the look out," was issued for a white Pontiac. A Neshoba County deputy spotted the car in Philadelphia, Mississippi. The vehicle traveled at a high rate of speed when the deputy started to pursue it. Another car pulled in front of it, and the vehicle flipped in front of the Golden Moon Casino.

4

¶11.    Dante Evans and Chasity Davis[3] were apprehended at the scene of the wreck. Gunn jumped from the vehicle and ran across the highway. He jumped into a white work truck owned by the Pearl River Resort and drove off. A second pursuit began. Deputies and city police chased the truck with speeds that exceeded 100 miles per hour. At one point, Gunn ditched the truck and started to run. He was found thirty minutes later in the woods. A weapon was found on a porch of a nearby house. The police recovered black Nike tennis shoes with a green "swoosh" being worn by Gunn.

¶12.    Gunn was transported back to Jackson by Investigator Maurice Kendrick and Detectives Eric Smith and Richard Stevenson. Gunn told them to tell Morris's family, his wife and children, that he was sorry and that it was not supposed to happen like that.

¶13.    Gunn's girlfriend, Chasity Davis, testified that she and Evans's girlfriend, Nankedia Lowe,[4] waited in a car across the highway from the E. Com Lodge while Gunn and Evans robbed it. She said Gunn and Evans ran across the highway wearing Halloween masks and carrying guns, and got in the car. One of the men was carrying a cash register. The men told them that Gunn had kicked in the door and Evans had shot someone. Davis testified that at some point, Gunn told her that he was with Evans when Evans shot Morris. Gunn told her that the man had tried to take a gun from Evans and Evans shot him. Gunn told her he thought Evans had killed the man.

¶14.    Nankedia Lowe was Evans's girlfriend. When she testified before the jury, she was

---

[3] Davis was charged with several crimes that arose out of the robbery of the E. Com Lodge and the shootings of Patel and Ava. She pled guilty to conspiracy to commit robbery.

[4] Lowe pled guilty to conspiracy to commit robbery in connection with her role in the E. Com Lodge robbery.

asked about the E. Com Lodge robbery, whether she was nervous, and whether she was scared. She was unresponsive to all three questions. Upon request, and without objection, the court declared her a hostile witness and the State was allowed to ask leading questions. She acknowledged her signature on a statement she gave police on September 16, 2010, and it was admitted into evidence without objection. Her testimony about her involvement in the E. Com Lodge robbery was materially consistent with Davis's testimony. She testified that she and Davis waited across the highway for Gunn and Evans and that Gunn and Evans ran and got in the car with money and all four then left. The only two facts in Lowe's statement to the police that she claimed not to remember on the stand were the fact that Evans and Gunn planned the robbery and the fact that Gunn had a pistol when he got in the car after the robbery. Defense counsel used her statement to the police to emphasize her role and that of Evans and Davis, and to minimize her knowledge of Gunn's role. She reiterated on cross-examination that she had no direct memory of Gunn having a pistol when he returned to the car.

¶15. When Evans was arrested, he gave a statement detailing the Morris assault and admitting that he was the one who shot Morris. He stated that he did not want to be a snitch and denied that Gunn was with him. Evans pled guilty on April 17, 2012. In his sworn description of the crime, he stated that Gunn and he robbed Morris and that both he and Gunn pulled their firearms on Morris. Evans stated that he was the one to shoot Morris and that he and Gunn then fled. At trial, Evans gave a proffer outside the presence of the jury, in which he stated that he had lied when he said that Gunn was with him and that, in fact, Gunn was not present. During his proffer, Evans was impeached with his guilty-plea testimony

6

that Gunn was involved in the Morris robbery. Defense counsel elected to have all three versions of Davis's statements presented to the jury. The jury heard officers' testimony about Evans denying Gunn was present, and heard an hour-long recorded interview in which he admitted his own guilt and denied Gunn was present. They also heard his guilty-plea testimony and his proffer.

¶16. Gunn was tried on seven counts. He was tried jointly, with no objection, for capital murder, two counts of felon in possession of a firearm, two counts of armed robbery, and two counts of aggravated assault. He was found guilty of all counts. He was sentenced to serve life in the custody of the Mississippi Department of Corrections for capital murder. He was sentenced to ten years each for both felon-in-possession-of-a-firearm counts, thirty-five years for each of the armed-robbery counts (including a ten-year gun enhancement for each count), and thirty years for each aggravated-assault count (including a ten-year gun enhancement for each count). All sentences were ordered to run consecutively. He filed a timely appeal.

## ANALYSIS

### I. Whether the trial court committed plain error when it failed to sua sponte sever the multiple-count indictment.

¶17. Gunn argues that the trial court committed reversible error when it failed to sever the counts of the indictment.[5] He asserts that the multiple-count indictment did not contain a common scheme or plan. He did not, however, move to sever any of the counts prior to or

---

[5] Although neither party mentions it, it appears that counts of the indictment were either severed, or the prosecution elected to try them separately. The original indictment contained ten counts; the first three dealing with Gunn's September 4, 2010 armed robbery and armed carjacking (while being a felon in possession of a firearm) of victim Jeffery Phillips. The jury only heard evidence on, and returned verdicts on, counts four through ten.

7

at trial.

¶18.   In *Rubenstein v. State*, 941 So. 2d 735, 761 (¶90) (Miss. 2006), the court held that

"issues not brought before the trial court are deemed waived and may not be raised for the

first time on appeal." *See also Jackson v. State*, 856 So. 2d 412, 415 (¶12) (Miss. Ct. App.

2003) ("As an appellate court, we cannot find that a trial judge committed reversible error

on a matter not brought before him to consider.").

¶19.   Gunn asks that we ignore his failure to request a severance and examine the issue

under the doctrine of plain error.

> A party who fails to make a contemporaneous objection at trial must rely on
> plain error to raise the issue on appeal because it is otherwise procedurally
> barred. *Williams v. State*, 794 So. 2d 181, 187 (¶23) (Miss. 2001). "The plain
> error doctrine requires that there be an error and that the error must have
> resulted in a manifest miscarriage of justice." *Id.* at 187. "Further, [the] Court
> applies the plain error rule only when it affects a defendant's
> substantive/fundamental rights." *Id.*   The plain error doctrine has been
> construed to include anything that "seriously affects the fairness, integrity or
> public reputation of judicial proceedings." *McClain v. State,* 929 So. 2d 946,
> 951(¶10) (Miss. Ct. App. 2005) (citing *United States v. Olano,* 507 U.S. 725,
> 732 (1993)).

*Smith v. State*, 984 So. 2d 295, 301 (¶14) (Miss. Ct. App. 2007) (parallel citations omitted).

¶20.   Mississippi's statute dealing with the joinder and severance of offenses is Mississippi

Code Annotated section 99-7-2 (Rev. 2007), which provides:

> (1) Two (2) or more offenses which are triable in the same court may be
> charged in the same indictment with a separate count for each offense if: (a)
> the offenses are based on the same act or transaction; or (b) the offenses are
> based on two (2) or more acts or transactions connected together or
> constituting parts of a common scheme or plan.
>
> (2) Where two (2) or more offenses are properly charged in separate counts of
> a single indictment, all such charges may be tried in a single proceeding.

8

¶21.    Gunn correctly cites *Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991), for the proposition that the relevant factors in considering proper joinder of counts are: (1) whether the time period between the offenses is short; (2) whether evidence of one count would be admissible for another count; and (3) whether the crimes are interwoven.

¶22.    As to the time element, Gunn's offenses were committed over a seventy-two-hour period. In *Harper v. State*, 102 So. 3d 1154, 1158 (¶10) (Miss. Ct. App. 2012), this Court held that the trial court did not abuse its discretion in overruling a motion to sever where the offenses against the two child-abuse victims were similar in nature, although occurring over a three-and-a-half-month period. *See also Rushing v. State*, 911 So. 2d 526, 535-36 (¶17) (Miss. 2005) (three forged prescriptions over five months properly tried together).

¶23.    The fact that Gunn's indictment involved different victims is also not controlling. "Whether the victim is common to all crimes has never alone been a factor to determine questions of trials involving multi-count indictments." *Harper*, 102 So. 3d at 1158 (¶12) (quoting *Rushing*, 911 So. 2d at 535 (¶17)). Nor is the fact that some of the witnesses would testify as to only some of the offenses. In *Corley*, the court approved a multi-count indictment charging threats against two different witnesses, occurring close in time and about a week and a half before they were to testify against the defendant at a trial. *Corley*, 584 So. 2d at 772; *see also Golden v. State*, 968 So. 2d 378, 383 (¶17) (Miss. 2007) (fact that some witnesses would testify to only one of two rapes does not make joinder improper).

¶24.    All of the offenses Gunn was charged with were similar in type – they involved armed assaults and robberies. In *Patrick v. State*, 754 So. 2d 1194, 1196 (¶11) (Miss. 2000), the court upheld a multi-count indictment concerning a "Scott County crime spree," finding the

9

offenses of aggravated assault, armed robbery, burglary of a dwelling, and grand larceny involved a "common scheme or plan" where, "[a]lthough the crimes involved different victims, the offenses were interrelated as they each involved assault and/or theft of property." *Id.* Likewise, all of the offenses Gunn was charged with had the same motive – acquiring money. *See Stribling v. State*, 81 So. 3d 1155, 1162 (¶34) (Miss. Ct. App. 2011) (motive was the same for three cocaine sales over two months– distributing cocaine for profit).

¶25. Although Gunn devotes substantial argument to whether evidence of each separate crime was admissible under Mississippi Rule of Evidence 404(b), this factor is not dispositive, or even particularly relevant. In *Harper*, the court noted: "The issue of whether the evidence might be admissible pursuant to Mississippi Rule of Evidence 404(b) is not relevant to the trial court's consideration of a motion to sever offenses in a multi-count indictment." *Harper*, 102 So. 3d at 1158 (¶9) (citing *Corley*, 584 So. 2d at 772 n.1).

¶26. Here, Gunn and Evans participated in a three-day crime spree across the Jackson area. The first day, they murdered a man while robbing him outside of a convenience store; the second day, they robbed another man outside of a gas station; and the third day, they shot two people, whom they then robbed, at a motel. The motive for each crime was the same: stealing money. The means and method of each crime were the same: threatening, and where necessary, shooting victims with a gun. The criminal participants were the same: Gunn and Evans (joined at the end by their girlfriends, when a get-away vehicle was used). They were found together while fleeing after the third armed robbery. We cannot find that Gunn's indictment should have been severed. There was no error in the trial court's failure to sua sponte sever the counts of the indictment, much less plain error. Thus, in addition to this

10

issue's procedural bar, we find this issue has no merit.

**II.  Whether the trial court abused its discretion or committed plain error in the admission of evidence.**

¶27.  "The admissibility of evidence is within the discretion of the trial court[.]" *Porter v. State*, 869 So. 2d 414, 417 (¶18) (Miss. Ct. App. 2004).  Absent an abuse of discretion, the trial court's decision on whether to admit evidence or exclude it will not be disturbed on appeal. *Id.*  Further, "[s]uch error will warrant reversal only when the abuse of discretion has resulted in prejudice to the accused." *Moss v. State*, 977 So. 2d 1201, 1207 (¶4) (Miss. Ct. App. 2007) (quoting *Harris v. State,* 861 So. 2d 1003, 1018 (¶41) (Miss. 2003)).

¶28.  Gunn, however, did not object to the admission of these statements.

> In order to raise an error on appeal, Mississippi Rule of Evidence 103(a) requires that a contemporaneous objection on specific grounds must be made to the admission of evidence by the trial court. *Denson v. State*, 746 So. 2d 927, 930 (¶17) (Miss. Ct. App. 1999). . . . We can find no contemporaneous objection in the record to the questions offered by the State.  The trial court allowed the evidence to be admitted and [the defendant] should have objected at that point in order to preserve the evidentiary issues for appeal.  M.R.E. 103(a). [The defendant] is therefore barred from making such an assertion on appeal.

*Porter*, 869 So. 2d at 421 (¶27).

¶29.  Although we find that this issue is waived, our review of the record indicates that the trial court would have acted within its discretion to admit the following evidence, even if Gunn had objected.

**A.  Evidence of Separate Charged Offenses**

¶30.  Gunn first claims that it was error for the jury to hear evidence of the separate crimes committed over the three-day period.  This issue is procedurally barred due to Gunn's failure

11

to move for a severance and is without merit based upon our finding that the crimes were properly tried together.

### B. Evidence that Gunn Threatened Witnesses

¶31. Gunn argues that it was error for the trial court to allow three witnesses to testify that they were threatened by Gunn in regard to their trial testimony. Gunn did not object to any of this evidence when it was introduced.

#### 1. Chasity Davis

¶32. The trial was held in December 2012. In August 2012, Gunn wrote Davis a letter, which was introduced into evidence. In the letter, Gunn warned her not to testify against him, saying at one point that "play[ing] with people's feelings" like that was "how people get killed." Davis testified that she construed this as a threat from Gunn not to testify against him. Davis's testimony about the threatening letter, and the letter itself, were introduced into evidence, without objection.

#### 2. Sylvester Wright

¶33. Gunn complains about Wright's testimony that, while he and Gunn were incarcerated together, Gunn threatened him. While Wright was being booked on unrelated charges, Gunn, by coincidence, was in the same lock-up area. When Gunn heard Wright's name called, he approached him. Wright testified: "He told me that if he see me come in the prison that – in Greene County, he run Greene County and he got me if I come to prison. So when we get in the courtroom, let me drive." Wright testified that he considered Gunn's comments to be a threat not to testify against him. There was no defense objection, either when the testimony was proffered outside the jury's presence, or when Wright testified before the jury.

### 3.    Nankedia Lowe

¶34.    Obtaining Lowe's trial testimony was no easy task.  The State notified the court and defense counsel during trial that Lowe had informed the prosecutors that she had been threatened, so a proffer of her testimony outside the jury's presence was made in order to assess how to handle this information.  Gunn was present in the courtroom during the proffer. The proffer started with Lowe's involvement in the E. Com Lodge robbery.  She admitted being there with Davis and Evans.  When asked if anyone else was there, she would only shake her head negatively.  She said that she could answer the question but just shook her head when the name of the fourth person present was asked.  Eventually, she said that Gunn was there.  She had to be repeatedly prompted to speak audibly.  When asked who planned the robbery, she simply shook her head negatively.  After the trial court denied the State's request to have her declared a hostile witness, the prosecutor then asked Lowe if she had been threatened.  Lowe shook her head negatively.  When asked specifically if Gunn had threatened her, she did not respond at all.  The court directed her to answer and she said "No."  The prosecutor informed the court that she was surprised by this response and the court then declared Lowe a hostile witness. Defense counsel did not object. Defense counsel requested that the witness not be allowed to testify without a lawyer to advise her.  The jury was released for the day.  Lowe's attorney arrived and consulted with her.  He informed the court that she was "extremely nervous and apprehensive about testifying."  Upon re-taking the witness stand, Lowe said that she had received a telephone call the previous Saturday from Gunn and an individual known as "Eric," via a three-way call.  Gunn knew she was supposed to testify at his trial, and he wanted her to not testify against him.  She said that

13

Gunn and Eric told her: "I better not say the wrong thing. I better not testify." She perceived this as a threat. Lowe testified that when she arrived at the courthouse that day to testify, the defendant's brother, known as "Pumpkin," told her that she "better not say nothing and just act like I don't know." Lowe said she had previously been threatened and assaulted concerning her being a witness against Gunn. She testified that a girl drove to her house and called her to her car. When Lowe got to the car, the girl mentioned Gunn's name and asked if Lowe was "testifying at the trial." The girl then pulled a knife and stabbed Lowe. Lowe said that she was afraid because of the threats.

¶35. Defense counsel requested permission to cross-examine her, agreeing that, if she became unavailable, the transcript could then be admitted into evidence. The court agreed and defense counsel was allowed to fully cross-examine her. Lowe left the courthouse following her proffer, after declining an offer of protective custody. She was instructed to return the next day for her testimony but failed to do so.

¶36. Lowe eventually returned to the courthouse and testified before the jury. In addition to her testimony about her involvement in the E. Com Lodge robbery, and her guilty plea to charges stemming from it, she testified that she had been threatened. She testified, without objection, that she had been threatened by Gunn during a three-way telephone call. She also testified that she had been assaulted by a girl with a knife over her upcoming testimony, and that she had been threatened by Gunn's brother, "Pumpkin," while she was at the courthouse. Detective Smith testified, without objection, that Lowe reported the threats before she testified and that the investigation was "on-going."

¶37. In arguing that the threat evidence was improperly admitted, Gunn relies upon *Harvey*

14

*v. State*, 666 So. 2d 798 (Miss. 1995). In *Harvey*, the defendant was on trial for assault and offered an alibi defense. *Id.* at 799. The State called a rebuttal witness to refute the alibi. *Id.* The State sought to introduce the witness's testimony that, prior to trial, she had received a telephone call from an unknown male saying that she would not live to testify in court. *Id.* at 800. The defendant objected that the threat was hearsay. *Id.* The trial court permitted the testimony, not for its truthfulness, but only to show the witness's state of mind. *Id.* In closing argument, the State argued that someone connected with the defense had threatened the witness. *Id.* The defendant was convicted and appealed. *Id.* The Mississippi Supreme Court rejected the defendant's argument that the testimony was unduly prejudicial, because he did not raise this objection at trial. *Id.* The Court reversed the conviction, however, because the State went beyond the limited admission of the testimony to argue that the defendant was responsible for the threat. *Id.* at 801. Since there was no substantive evidence of the threat, the argument was impermissible. *Id.* at 802.

¶38.   In this case, the State did not err in attributing the threats to Gunn in closing argument. Davis, Lowe, and Wright all testified that Gunn directly threatened them. Additionally, the threats to Lowe coming from Gunn's brother, and the woman who threatened Lowe with a knife for being a witness in Gunn's trial,[6] were sufficiently connected to Gunn to be proper argument.

¶39.   In *Warren v. State*, 183 Miss. 682, 184 So. 324 (1938), the court held that evidence

---

[6] Although the assailant did not refer specifically to "Gunn's" trial, Lowe testified that it was the only trial at which she was to be a witness and she perceived it as a threat for testifying against Gunn.

of threats by the defendant against a witness was admissible to show that the defendant was attempting to suppress material evidence. The court explained the probative value of the evidence:

> It appears to us that the evidence was competent for the purpose of showing that the appellant, an interested party, was trying to prevent Dallas from testifying to what Dallas conceived the truth to be, or from testifying to the facts to which he had testified on the former trial; and that his assault on Dallas was an attempt to intimidate a material witness, and prevent his testifying to his conception of the truth.
>
> We think the dispute and assault came about by reason of the transaction for which the appellant was tried, and was calculated to influence the witness, either by persuasion or coercion, from testifying in the case for which the appellant was shortly to be tried. In other words, it was an attempt to suppress material evidence at the approaching trial, and could be shown as a material fact at that trial.

*Id.* at 690, 184 So. at 326. In *Strickland v. State*, 209 So. 2d 840, 841 (Miss. 1968), Strickland argued that the trial court erred when it allowed a witness to testify that Strickland tried to bribe the witness and then threatened to "blow her up" if she did testify against him. The court held that evidence of a defendant's threats to prevent a witness from testifying against him was properly admissible under Mississippi Rule of Evidence 404(b). *Id.* at 841.

¶40.    We find that the threats, including those from Gunn's brother and the knife-wielding girl, were sufficiently connected to Gunn to be admissible. There was no error, much less plain error, in the admission of the threat evidence. Thus, we find no merit to this issue.

### C.    Hearsay

¶41.    Gunn also argues that, although he did not object to, and on occasion specifically sought the admission of, prior statements of witnesses, this Court should reverse his conviction due to the admission of hearsay evidence.

16

¶42. "Hearsay is defined as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter' and is generally not admissible at trial." *Moss*, 977 So. 2d at 1207 (¶5) (citing M.R.E. 801(c); M.R.E. 802). Because Gunn did not raise a hearsay objection, or any objection at all, the record does not reveal whether the statements were offered under an exception to the hearsay rule. Likewise, there was no request for a ruling from the trial court as to whether the prior statements were offered as substantive evidence, or to rebut a claim of recent fabrication, or to impeach a recalcitrant witness. Failure to object thus results in waiver. *Cole v. State*, 525 So. 2d 365, 371 (Miss. 1987); *Moss*, 977 So. 2d at 1208 (¶9).

### 1. Prior Statements of Dante Evans

¶43. Gunn's accomplice in the three-day crime spree, Dante Evans, gave three conflicting accounts of what transpired. He gave a statement to police upon his arrest. He described the Morris robbery and shooting when he pled guilty to that offense. He gave a proffer at trial, outside the jury's presence. The defense stipulated to the admission of all three statements. The defense strategy apparently was to place all the statements before the jury and argue that Evans either could not be believed, or that only his statements exonerating Gunn could be believed.

¶44. Therefore, Gunn cannot complain on appeal about something he caused to happen at trial. "A defendant cannot complain on appeal of alleged errors invited or induced by himself." *Smith*, 984 So. 2d at 302 (¶18) (quoting *Singleton v. State*, 518 So. 2d 653, 655 (Miss. 1988)).

### 2. Prior Statements of Lowe

17

¶45.    Gunn argues that Lowe should not have been declared a hostile witness because the State was not truly surprised when she was non-responsive on the witness stand.  Gunn contends that surprise is a condition precedent to declaring a witness hostile, citing *James v. State*, 124 So. 3d 693, 698 (¶17) (Miss. Ct. App. 2013) (trial court erred in allowing prior inconsistent statements in evidence where there was no showing of surprise or unexpected hostility), and *Wilkins v. State*, 603 So. 2d 309, 318-22 (Miss. 1992) (despite the broad language of Mississippi Rule of Evidence 607, permitting impeachment of a party's witness, surprise or unexpected hostility is required prior to admission of prior inconsistent statements).[7]

¶46.    *James* and *Wilkins* are distinguishable for two reasons.  First, Gunn's counsel agreed to the introduction of the statements, unlike defense counsel in *James* and *Wilkins*.  In this case, Gunn's counsel agreed to the introduction of the statements and then used them to Gunn's advantage in cross-examining the witnesses.  Secondly, in both *James* and *Wilkins*, the witnesses' trial testimony was diametrically opposed to the prior statements.  In this case, they were consistent on all material points.

¶47.    In *Osborne v. State*, 54 So. 3d 841, 845 (¶14) (Miss. 2011), the Mississippi Supreme Court held that *Wilkins* should be read in the disjunctive; that is, either surprise or hostility is required, but not both.  In this case, Lowe was the only witness declared hostile and, at the time she was declared hostile, the State claimed surprise.  That surprise is verified by the circumstances.  The State was calling Lowe outside the jury's presence to proffer her

---

[7] The fact that the *Wilkins* rule appears out of step with modern interpretation of Rule 607 was noted in *James*, 124 So. 3d at 701-05 (¶¶26-39) (Maxwell, J., specially concurring).

testimony about the threats she had told them about. When she balked at describing the threats, the State's surprise was reasonable. Further, the State's use of leading questions was not improper. The trial court has considerable discretion to "allow leading questions if needed for the development of a witness's testimony." *Id.* at (¶16).

¶48. Gunn contends that the State erred in closing argument when it used Lowe's statement as substantive evidence rather than just impeachment. There is indeed a difference between substantive evidence and impeachment evidence, and if Gunn had objected when the statements were offered into evidence, the trial court would have had an opportunity to specifically instruct the jury on the difference between the two. As it was, however, Gunn agreed to the introduction of the statements into evidence with no limitation. The State was therefore free to refer to them as substantive evidence.

¶49. In any event, Lowe testified only about the E. Com Lodge robbery. Lowe's testimony was cumulative of Davis's as it relates to the E. Com Lodge robbery, and therefore, any error in the admission of Lowe's prior statement would be harmless. An error is harmless when "the same result would have been reached had it not existed." *Pitchford v. State*, 45 So. 3d 216, 235 (¶71) (Miss. 2010).

¶50. Gunn complains that Detective Smith and Officer Patricia Wilder were allowed to testify to hearsay statements of Lowe. These statements were admitted without objection and were consistent with Lowe's trial testimony. Defense counsel used these statements to cross-examine Lowe and emphasize the roles of Davis, Lowe, and Evans in the E. Com Lodge robbery and downplay that of Gunn. Since the statements were admitted without objection, this issue is procedurally barred. Further, because they were consistent with Lowe's trial

testimony, which was subject to cross-examination, we find no plain error in the admission of these statements.

### 3. Prior Statements of Davis

¶51. Davis's trial testimony has been recounted earlier. During Davis's testimony, the State used two of Davis's statements to the police dated September 15, 2010, to refresh her recollection. In one, she talked about the E. Com Lodge robbery. In this statement, Davis admitted that she and Lowe knew Gunn and Evans were going to rob the E. Com Lodge. In the other statement, Davis related Gunn's statement to her that he was with Evans when Evans shot Morris. She testified that Evans admitted shooting someone but that Gunn did not say he shot anyone. She testified that she told the police the truth in her statements. There was no objection by the defense to the use of either statement. Davis's E. Com Lodge robbery statement was introduced into evidence without objection.

¶52. On cross-examination, defense counsel used Davis's E. Com Lodge robbery statement to the police to impeach her whenever she attempted to downplay her participation in the E. Com Lodge robbery. He used the statement to emphasize Evans's role in the robbery and downplay Gunn's role. On cross-examination, defense counsel had Davis agree that her testimony about Gunn's admission to being present when Morris was shot was not in her E. Com Lodge robbery statement. On redirect, Davis reiterated that she had told the police on September 15, 2010, that Gunn had told her he was with Evans when Evans shot Morris, and Gunn described the encounter. This statement was then introduced without objection.

¶53. The State also introduced a letter Davis wrote to Gunn, without objection. In the letter she said: "I wish y'all wouldn't did [sic] that s***," but expressed loyalty to Gunn and urged

20

him to testify against Evans because Gunn "didn't really have nothing to do with it . . . ." Davis explained that she meant that, although Gunn was with Evans during the E. Com Lodge robbery, he did not shoot anyone. Davis testified that Gunn asked her to write a letter saying he did not commit any crimes. Evans wrote a letter in December 2011, which was also introduced in evidence, without objection. Davis wrote: "to whom it may concern," and she said she had falsely accused Gunn of "robbery, shooting, and anything else," but that "I[,] Chasity, and Bennie Gunn didn't have anything to do with these crimes." She testified that she wrote this, although it was not true, because Gunn wanted her to.

¶54. Gunn complains that Detective Smith and Officer Wilder were allowed to testify to these same two statements Davis made to the police. As noted, these statements were admitted without objection and were consistent with Davis's trial testimony. Defense counsel used these statements to cross-examine Davis and emphasize the roles of Davis, Lowe, and Evans in the E. Com Lodge robbery and downplay that of Gunn. Because the statements were admitted without objection, this issue is procedurally barred. Further, because they were consistent with Davis's testimony, which was subject to cross-examination, we find no plain error in the admission of these statements.

### 4. Testimony About "[A]nonymous [S]ources"

¶55. In describing the steps he took on September 10 to investigate the Morris shooting, Detective Smith testified, without objection, that an anonymous source told him that Dante Evans was seen running in the area and he might have some involvement in the shooting. Detective Smith then testified that, on that same date, while investigating an unrelated shooting, an anonymous source told him that Gunn and Evans might be involved in the

21

Morris shooting. Defense counsel objected that the prosecution was trying to implicate Gunn in an unrelated crime. When the prosecutor explained that there was no intention to implicate Gunn in a different crime, but that the witness was merely explaining the steps in the investigation, defense counsel expressed satisfaction and requested no ruling from the court. The anonymous witnesses were never referred to again during the trial.

¶56. Since the trial objection was on a different ground and was abandoned, this issue is procedurally barred. *Montana v. State*, 822 So. 2d 954, 959 (¶12) (Miss. 2002) ("[A]sserting grounds for an objection on appeal that differ[] from the ground given for the objection at the trial level does not properly preserve the objection for appellate review.").

¶57. In any event, police officers are allowed to mention information they receive, without going into detail, to explain what they did in an investigation. *Smith*, 984 So. 2d at 303 (¶19); *see also Rubenstein v. State*, 941 So. 2d 735, 764 (¶111) (Miss. 2006) (statements admitted to explain an officer's course of investigation are not hearsay). "The Mississippi Supreme Court has held that admitting out-of-court statements made to the police during the course of their investigations is permissible." *Gray v. State,* 931 So. 2d 627, 631 (¶14) (Miss. Ct. App. 2006) (citing *Swindle v. State,* 502 So. 2d 652, 658 (Miss. 1987)).

### D. Uncharged Bad Acts

#### 1. Flight

¶58. Gunn complains that, although he stipulated to the introduction of Evans's guilty-plea transcript, it contained material that should have been redacted. Specifically, Gunn complains about the following statement: "In Philadelphia, Mississippi[,] Mr. Evans and Mr. Gunn were apprehended in unrelated cases where detectives of the Jackson Police

Department interviewed Mr. Evans, and he was – and he confessed to the crimes." If Gunn sought to have this reference redacted from the evidence given to the jury, he should have ensured that it was properly redacted before submission. In any event, the brief reference is entirely innocuous as it pertains to Gunn. The jury properly heard evidence that Gunn and Evans were arrested following a lengthy chase. The jury heard no evidence that they were fleeing any offense other than the charged offenses. The prosecution did not invite them to speculate that Gunn had committed even more offenses than he was charged with. There is no merit to this issue.[8]

¶59.   Gunn also complains about Neshoba County Sheriff's Department Investigator Ralph Sciple's testimony about the flight and apprehension following the "be on the lookout" report. Gunn made a generic motion before trial to exclude all evidence of "other bad acts" by him. The trial court took up the motion prior to the start of trial. Gunn's only argument was to exclude evidence of the chase and apprehension in Neshoba County. The trial court concluded that evidence of flight and material evidence recovered from Gunn at the time of his arrest in Neshoba County made that testimony admissible, and overruled the motion in limine. Gunn requested no other rulings as to "other bad act" evidence. There were no objections to Investigator Sciple's testimony.

¶60.   Even if we consider the objection to be preserved by Gunn's pretrial motion in limine,

---

[8] Gunn also complains that Evans's guilty-plea transcript contains statements from Morris's family. Again, Gunn bears the responsibility of checking evidence that is presented to the jury to ensure that any desired redactions are sufficiently made. The statements merely asked that Evans be held accountable for the murder of Morris and do not reference Gunn at all. This did not unduly prejudice Gunn.

the evidence was properly admitted to show Gunn's consciousness of guilt[9] and possession of incriminating evidence. "Where substantially necessary to present to the jury the complete story of the crime[,] evidence or testimony may be given even though it may reveal or suggest other crimes." *Bailey v. State*, 956 So. 2d 1016, 1042 (¶102) (Miss. Ct. App. 2007). The trial court did not abuse its discretion in allowing evidence of Gunn's flight and apprehension.

### 2. Reference to "[K]idnapping"

¶61. When Detective Smith was testifying about how he obtained the black Nike shoes from Gunn in Neshoba County, the prosecution asked what Gunn was doing in Neshoba County. Smith answered: "He had been taken into custody following an armed carjacking, kidnapping and a subsequent armed carjacking." Defense counsel objected. There was an off-the-record discussion outside the jury's presence. When the jury was re-called, Detective Smith was asked what charges Gunn was arrested on from Hinds County and he said: "Armed robbery and armed carjacking. . . . I misspoke about the kidnapping." Defense counsel was apparently satisfied with this prompt correction, and trial proceeded with no further objection or request for instruction to the jury. Gunn's counsel on appeal does not explain how this brief, corrected reference to a kidnapping caused prejudicial harm to Gunn and we find none.

### III. Whether the firearm sentence enhancements subjected Gunn to double jeopardy.

---

[9] "[A]n accused's flight, escape from custody, resistence to arrest, concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus guilt itself." *McClendon v. State*, 387 So. 2d 112, 115 (Miss. 1980).

¶62. Gunn received four firearm sentence enhancements pursuant to Mississippi Code Annotated section 97-37-37(2) (Rev. 2014). Gunn argues that to convict him for being a felon in possession of a weapon under Mississippi Code Annotated section 97-37-5 (Rev. 2014), and to then increase his sentences for the armed-robbery and aggravated-assault counts because he was a convicted felon using a firearm, constitutes a double-jeopardy violation. No double-jeopardy objection was raised at trial or sentencing. However, because the protection against double jeopardy is a fundamental right, it may be raised for the first time on appeal. *Graves v. State*, 969 So. 2d 845, 846-47 (¶6) (Miss. 2007).

¶63. Gunn acknowledges that to determine whether a person has been subjected to double jeopardy, this Court applies the same-elements test from *Blockburger v. United States*, 284 U.S. 299 (1932). "Where the same act or transaction constitutes a violation of two distinct statutory provisions," multiple punishments in a single prosecution violate double jeopardy, unless "each provision requires proof of a fact which the other does not." *Id.* at 304. Gunn then argues that one cannot violate the firearm-enhancement provision without satisfying all of the elements of the felon-in-possession-of-a-weapon statute. Pursuant to Mississippi Code Annotated section 97-37-5, the State must prove two things for a person to be convicted of felon in possession of a weapon. These are: (1) the defendant was in possession of a firearm, and (2) the defendant had previously been convicted of a felony crime. *Cooley v. State*, 14 So. 3d 63, 66 (¶13) (Miss. Ct. App. 2008). While this is true, the firearm-enhancement provision is not a separate offense. This Court, in *Lewis v. State*, 112 So. 3d 1092 (Miss. Ct. App. 2013), held:

> [S]entence-enhancement statutes under which additional terms of

imprisonment are imposed do not trigger double-jeopardy violations. *Mayers v. State*, 42 So. 3d 33, 45 (¶50) (Miss. Ct. App. 2010). The rationale is that sentence enhancements do "not set out separate elements of the underlying felony." *Id.* Section 97-37-37(2) merely imposes an elevated sentence for use or display of a firearm during the commission of a felony, and it does not delineate an independent substantive offense.

*Lewis*, 112 So. 3d at 1097 (¶15); *see also Clark v. State*, 127 So. 3d 292, 297-98 (¶¶18-19) (Miss. Ct. App. 2013) (sentence-enhancement provision is not a separate offense for double-jeopardy purposes). There was no double-jeopardy violation.

### IV. Whether the prosecution improperly commented on Gunn's right to remain silent.

¶64. Gunn argues that the State improperly commented on his right to remain silent. At trial, Detective Stevenson testified that Gunn told several officers to tell Morris's wife and children that he was sorry about what happened and that it was not supposed to have gone down that way. On cross-examination, Detective Stevenson was asked about that statement as follows:

> Q:    Okay. And there was no statement made by Mr. Gunn while he was given his *Miranda*[10] rights or anything like stating anything like that, to your knowledge correct?
>
> A:    No, he – did not make a statement.

¶65. A bench conference was held outside the presence of the jury, where the trial court told the State that while the door had been opened on cross-examination, it was not necessary to comment on Gunn's choice to remain silent on redirect. Subsequently, on redirect, Detective Stevenson was asked by the State if Gunn made a statement after being

---

[10] *Miranda v. Arizona*, 384 U.S. 436, 471 (1966) (mandating that the custodian read the accused his or her right to remain silent and right to counsel prior to an interrogation).

26

Mirandized, and Detective Stevenson said Gunn did not. Gunn objected. In another bench conference outside the presence of the jury, the trial court told the State that the issue had already been addressed and that it was "not appropriate to leave th[e] jury with an impression that the exercise of one's constitutional right is some way a violation . . . ." The trial court instructed the State to cure the situation with a follow-up question about whether this right to refuse is unusual. The State then asked:

> Q. And everybody in this – defendants in this country have a right to assert not to speak to the police?
>
> A. That's correct.
>
> Q. Everybody has that right?
>
> A. That's correct.

¶66. The examination concluded and the witness was released from the stand with the defense making no further objection or requesting any further curative action by the court.

¶67. Gunn now asserts that Detective Stevenson's comments were prejudicial and resulted in a decision by the jury that was influenced by prejudice. Gunn blames the court for attempting to cure the error and claims that this attempt to fix the problem created more prejudice. The proper test is "whether . . . the natural and probable effect of the statement is to create an unjust prejudice against the accused [resulting] in a decision influenced by prejudice." *Gunn v. State*, 56 So. 3d 568, 571 (¶14) (Miss. 2011) (citations omitted).

¶68. In *Caston v. State*, 823 So. 2d 473 (Miss. 2002), Caston argued that he did not have a fair trial because the State repeatedly made reference to Caston's failure to make a post-arrest statement. The court held: "Clearly, the defense opened the door and invited

questioning of [Caston] about alleged statements given in 1970. 'A defendant cannot complain on appeal of alleged errors invited or induced by himself.'" *Id.* at 502 (¶101).

¶69. Here, it was the defense that brought out the fact that Gunn had not made a statement after being advised of his *Miranda* rights. All the State did was have the witness repeat that Gunn had not made a statement after being advised of his *Miranda* rights. Although the defense had opened this door, the trial court acted quickly to ensure that the jury was not left with an improper impression. While Gunn's appellate counsel faults the trial court for its corrective action, Gunn offers no better remedy to ameliorate the problem his questioning caused.

¶70. We cannot say that this brief reference was unduly prejudicial, especially in light of defense counsel's failure to request any alternative curative measures. Thus, as in *Caston*, we find that Gunn's issue is without merit.

### V. Whether the verdict stands against the weight and sufficiency of the evidence.

¶71. Gunn argues that the evidence is insufficient to support the verdict, and the verdict is against the overwhelming weight of the evidence.

¶72. When faced with a sufficiency-of-the-evidence claim, the evidence should be considered in the light most favorable to the State. *Bush v. State*, 895 So. 2d 836, 843 (¶17) (Miss. 2005). The main question "is whether the evidence shows 'beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.'" *Id.* at (¶16) (quoting *Carr. v. State*, 208 So. 2d 886, 889 (Miss. 1968)). The court must ask "whether, after viewing the evidence in the light

28

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). This Court will consider whether the "facts and inferences . . . 'point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty[.]" *Id.* (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)). But if the evidence "is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." *Id.* (quoting *Edwards*, 469 So. 2d at 70).

¶73. In reviewing a challenge to the weight of the evidence, the evidence is viewed in the light most favorable to the verdict, and the verdict will only be overturned when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Id.* at 844 (¶18).

¶74. Gunn does not claim that any particular element of the crimes he was convicted of was unproven, other than to claim that his identity as the perpetrator was unproven. Gunn argues that he was not identified at the scene where Morris was killed. However, Rokita McDougal saw two men in her neighbor's backyard, which was near the crime scene, just after Morris's murder. She identified Gunn in a photo lineup shortly after the crime. She also identified the shoes Gunn was wearing while he was in the neighbor's yard that were ultimately recovered on Gunn's person once he was apprehended. She identified Gunn in the courtroom as the man acting suspiciously in her neighbor's yard. The jury heard Evans's sworn

statement that he shot Morris while he and Gunn were robbing Morris. This was corroborated by Davis hearing Evans on the phone admitting to shooting Morris and by Gunn telling Davis that he was present when Evans shot Morris. DNA evidence linked Evans to two items of clothing similar to that worn by the robbers in the store surveillance video. These two items of clothing were abandoned on the path between the store and where Gunn was seen by Rokita McDougal.

¶75. This is sufficient to convict Gunn as an aider and abettor. *Stevens v. State*, 808 So. 2d 908, 922 (¶47) (Miss. 2002) (aiding-and-abetting liability established where defendant and accomplice assaulted someone and accomplice fired fatal shot). Gunn points out that an aider and abettor must do something to incite, encourage, or assist the crime, *id.* at 922-23 (¶48), and that mere presence is insufficient. *Vaughn v. State*, 712 So. 2d 721, 724 (¶11) (Miss. 1998). Gunn was no mere bystander, however. The video showed that he approached Morris wearing something over his head to conceal his identity. Following a brief and violent encounter, Gunn fled the scene with Evans. Evans explained in his guilty plea that they both had guns and that they robbed Morris together. This evidence makes Gunn an accomplice and not a mere bystander, even though Evans was the one who shot Morris.

¶76. In regard to the armed robbery of Wright, Gunn alleges that the only descriptions Wright gave to police about the men who robbed him were generic descriptions. However, Wright identified Gunn and Evans in separate photo lineups shortly after the crime. Evans identified Gunn in court as one of the men who robbed him. Furthermore, Wright's testimony that Gunn threatened him prior to his testimony was a factor the jury could consider in gauging the credibility of Wright's testimony. The jury might reasonably

30

question why Gunn would threaten a stranger if Gunn did not participate in the armed robbery of Wright.

¶77. Finally, Davis and Lowe both connected Gunn to the robbery and shootings at the E. Com Lodge. Gunn threatened both Davis and Lowe in an attempt to prevent them from testifying against him. Gunn, citing *Williams v. State*, 32 So. 3d 486, 490-91 (¶¶14-17) (Miss. 2010), asserts that this accomplice testimony was weak and contradictory, and therefore insufficient. *Williams* did not deal with a sufficiency-of-the-evidence claim. Rather, it dealt with when a cautionary instruction on accomplice testimony should be given, an issue not raised in this appeal. The law remains that even "uncorroborated accomplice testimony may be sufficient to convict a defendant" as long as it is not "unreasonable, self-contradictory or substantially impeached." *Grossley v. State*, 127 So. 3d 1143, 1148 (¶14) (Miss. Ct. App. 2013) (citations omitted). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Id.*; *see also Whitlock v. State*, 47 So. 3d 668, 676 (¶22) (Miss. 2010) (even the uncorroborated testimony of a single witness may be sufficient to support a conviction).

¶78. Evans and Gunn were accomplices on all the charged crimes. Lowe and Davis were additional accomplices in the E. Com Lodge crimes. While there were normal and to-be-expected differences in the three sets of testimonies, each corroborated the others on the crucial point: Gunn was a participant in all of the crimes.

¶79. Based on the entire record, we cannot find that the evidence was insufficient to support the jury's verdict, nor was the verdict against the overwhelming weight of the evidence. Thus, we find this issue is without merit.

## VI. Whether Gunn received ineffective assistance of counsel.

¶80. Gunn argues, in regard to any procedural bars, that his counsel was ineffective in failing to object or properly preserve issues for appeal. Gunn asserts that, because counsel on appeal is different than counsel at trial, he wishes to preserve this issue for post-conviction review.

¶81. To prove this claim, Gunn must show that: (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687-89 (1984). The burden of proof rests with Gunn to show both prongs. *McQuarter v. State*, 574 So. 2d 685, 687 (Miss. 1990). Under *Strickland*, there is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To overcome this presumption, "[t]he defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, "[c]ounsel's decisions whether or not to file motions, call certain witnesses, ask certain questions, and make certain objections fall within the definition of trial strategy," and typically do not amount to ineffective assistance of counsel. *Pittman v. State*, 121 So. 3d 253, 258 (¶14) (Miss. Ct. App. 2013) (citations omitted).

¶82. When a claim of ineffective assistance of counsel is raised on direct appeal, rather than in a motion for post-conviction relief, the claim should be addressed only when: "(1) the record affirmatively show[s] ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Colenburg v. State*, 735 So. 2d 1099,

32

1101 (¶5) (Miss. Ct. App. 1999). Review on direct appeal of an ineffective-assistance-of-counsel claim is confined strictly to the record. *Id.* at 1102 (¶6).

¶83. There is no stipulation by the parties that the record is sufficient to address this claim; in fact, Gunn states that he is raising the issue only to avoid a waiver. After a review of the record, we note that many of the decisions by defense counsel appear to be based on trial strategy, but because Gunn's trial counsel has not been afforded an opportunity to explain his actions, we do not find that the issue is appropriate for resolution on direct appeal. We deny this issue without prejudice to afford Gunn the option to pursue an ineffective-assistance-of-counsel claim in a post-conviction proceeding. *See Archer v. State*, 986 So. 2d 951, 955 (¶15) (Miss. 2008).

## VII. Whether cumulative error exists to require reversal of Gunn's conviction.

¶84. Gunn claims that the cumulative effect of the many errors combines to require reversal. However, "[w]here there is 'no reversible error in any part, there is no reversible error to the whole.'" *Wilburn v. State*, 608 So. 2d 702, 705 (Miss. 1992) (quoting *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987)). Having found no error in this case, we find this issue to be without merit.

¶85. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF COUNT IV, CAPITAL MURDER, AND SENTENCE OF LIFE WITHOUT PAROLE; COUNTS V AND VII, FELON IN POSSESSION OF A FIREARM, AND SENTENCE OF TEN YEARS FOR EACH COUNT; COUNTS VI AND VIII, ARMED ROBBERY, AND SENTENCE OF THIRTY-FIVE YEARS FOR EACH COUNT; AND COUNTS IX AND X, AGGRAVATED ASSAULT, AND SENTENCE OF THIRTY YEARS FOR EACH COUNT, WITH ALL SENTENCES TO RUN CONSECUTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**